**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
QUEST DIAGNOSTICS INCORPORATED.,

                Plaintiff,

  -against-

HERITAGE VILLAGE REHAB AND SKILLED
NURSING, INC.,

                Defendant.
-------------------------------------------------------------X

**COMPLAINT**

Civil Action No. _____

Plaintiff QUEST DIAGNOSTICS INCORPORATED ("Plaintiff" or "Quest"), through its attorneys, The Glennon Law Firm, P.C., asserts the following upon information and belief, except for those allegations pertaining to Plaintiff, which is on personal knowledge, for its complaint against Defendant HERITAGE VILLAGE REHAB AND SKILLED NURSING, INC. ("Defendant") as follows:

**NATURE OF THIS ACTION**

1. Nursing homes have been the epicenter of the COVID-19 pandemic in the United States. It has been widely reported "that nearly 1 in 10 people who lived in nursing homes in the United States had died of the virus." *See* Jay Caspian Kang, *The Forgotten Nursing-Home Tragedy*, N.Y. Times, dated November 4, 2021: https://www.nytimes.com/2021/11/04/opinion/nursing-home-deaths.html. During the first months of the pandemic, the United States faced severe shortages and delays in diagnostic testing.  *See, e.g.*, *Despite Early Warnings, U.S. Took Months To Expand Swab Production For COVID-19 Test*, National Public Radio, last visited dated May 12, 2020: https://www.npr.org/2020/05/12/853930147/despite-early-warnings-u-s-took-months-to-expand-swab-production-for-covid-19-te.

2. On May 10, 2020, former Governor Andrew Cuomo issued an executive order mandating that all nursing homes and adult care facilities in the state must test their staff two times per week. *See* Executive Order 202.30, dated May 10, 2020, https://www.governor.ny.gov/sites/default/files/atoms/files/EO202.30.pdf (the "Executive Order"). The Executive Order directed that nursing homes and other adult care facilities "shall cooperate fully with Department of Health and local health department staff to facilitate such testing."

3. In furtherance of the directives in the Executive Order, the Department of Health entered into a written contract with Plaintiff to provide COVID-19 testing to nursing home personnel. *See* COVID-19 Laboratory Testing Services Agreement, dated May 18, 2020 (the "DOH Contract"). Under the terms of the DOH Contract, Plaintiff agreed to provide 7,500 COVID-19 tests per day to all personnel[1] of nursing homes and adult care facilities, adult homes, enriched housing programs and assisted living facilities ("Facilities") in New York starting in June 2020. *See id.* Plaintiff agreed to charge no more than $100 per test and that it would establish mechanisms for payment, which may have included invoicing the nursing home facilities directly for the testing services on an account bill basis.

4. On October 9, 2020 Plaintiff and Defendant entered into an agreement whereby the Defendant engaged the Plaintiff to provide COVID-19 testing to Defendant's employees (the "Agreement"). This Agreement also provided that Plaintiff would charge no more than $100 per test.

---

[1] Personnel included all employees, contracted staff, medical staff, operators, and administrators of Facilities, all of whom were required to be tested twice per week under the Executive Order.

5.      In accordance with the DOH Contract and the Agreement with Defendant, Plaintiff provided more than a thousand COVID-19 PCR tests for personnel and staff at Defendant's Facility. Defendant accepted Quest's testing services, provided specimens to Quest for testing and received from Quest the test results for Defendant's personnel and staff. After rendering testing services, Quest sent invoices to the Defendant on a monthly basis, which charged $100 per test—the rate set by the DOH Contract and the Agreement. Defendant did not object to the accuracy of the sums owed as stated in the invoices or the $100 per test rate while Quest was providing services to Defendant. To date, Defendant has refused to pay these invoices without a reasonable or proper justification. Accordingly, Defendant is liable to Quest for breach of contract, account stated, collection and litigation expenses (including among other things, attorneys' fees and costs), unjust enrichment, quantum meruit, in an amount no less than $175,700.00, plus statutory pre-judgment interest in the amount of 9 percent (9%) per annum.

## THE PARTIES AND JURISDICTION

6.      The Plaintiff is incorporated under the laws of Delaware, and has a principal place of business in Secaucus, New Jersey. Accordingly, Plaintiff is a citizen of Delaware and New Jersey for the purposes of diversity jurisdiction.

7.      Upon information and belief, Defendant Heritage Village Rehab and Skilled Nursing, Inc.. is a non-profit organization incorporated under the laws of New York State with a principal place of business at 4600 Route 60, Gerry, New York 14740 and operates Heritage Village Rehab and Skilled Nursing in Gerry, New York, which is a 120-bed senior care facility. Accordingly, Defendant is a citizen of New York for the purposes of diversity jurisdiction.

8. This Court has diversity jurisdiction over the claims asserted in this Action pursuant to 28 U.S.C. § 1332, as there is complete diversity of citizenship between the parties and the amount in controversy exceeds, exclusive of interests and costs, the sum of seventy-five thousand dollars ($75,000.00).

9. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this judicial district.

## STATEMENT OF FACTS

10. Quest offers access to diagnostic testing services for a wide variety of conditions, including cancer, cardiovascular disease, infectious disease, neurological disorders, and COVID-19.

11. From the outset of the COVID-19 pandemic in or about early 2020, New York experienced a surge in COVID-19 cases and mortalities compared to other states at that time. The COVID-19 pandemic was particularly acute in nursing home and long-term care facilities in New York.

12. To address the mounting crisis posed by COVID-19, former Governor Cuomo issued Executive Order 202.30, which provided in relevant part:

> "the operator or administrator of all nursing homes and all adult care facilities, including all adult homes, enriched housing programs and assisted living residences to test or make arrangements for the testing of all personnel, including all employees, contract staff, medical staff, operators and administrators, for COVID-19, twice per week, pursuant to a plan developed by the facility administrator and filed with the Department of Health . . . . the operator and administrator shall cooperate fully with Department of Health and local health department staff to facilitate such testing."

> "The Commissioner of Health is authorized to suspend or revoke the operating certificate of any nursing home or adult care facility if it is determined that such facility has not complied with this Executive Order . . . ."

> "Any nursing home or adult care facility which does not comply with this Executive Order shall be subject to a penalty for non-compliance of $2,000 per violation per day, . . . and any subsequent violation shall be punishable . . . with a penalty of $10,000 per violation per day."

> "Any personnel of a nursing home or adult care facility who refuse to be tested for COVID-19 pursuant to a plan submitted to the Department of Health shall be considered to have outdated or incomplete health assessments and shall therefore be prohibited from providing services to such nursing home or adult care facility until such testing is performed." *See* Executive Order 202.30.

13. Hence, the Executive Order placed obligations on Facilities to test staff for COVID-19 twice per week. The Executive Order also called for the imposition of sanctions for the failure to comply with the directive, including fines of up to $10,000 and the suspension of personnel who refused to test.

## QUEST'S CONTRACT WITH NEW YORK STATE TO PROVIDE COVID-19 TESTS

14. In furtherance of the Executive Order, Quest entered into a written agreement with the DOH, dated May 18, 2020, to provide COVID-19 PCR tests and related services to certain of the Facilities in New York State (the "DOH Contract"). A true and correct copy of the DOH Contract is attached hereto as **Exhibit A**. Among other things, Quest agreed to provide such Facilities:

> "testing for the detection of COVID-19 using a COVID-19 molecular test that has Emergency Use Authorization (EUA) from the U.S. Food and Drug Administration (FDA) or that has been approved by the New York State Department of Health as a laboratory developed test"

> "a daily minimum of COVID-19 Testing at a daily average rate of 7500 tests per day . . . , pursuant to electronic orders from the Facilities' medical directors, or other medical professional as otherwise approved by NYS and agreed upon by Lab Provider, who are authorized under state or federal law or guidance issued by federal or state authorities to order such laboratory tests."

> "turn-around time for reporting and resulting from receipt of the specimen may vary based upon population served, demand and priorities among patients but Lab Provider's will be required to provide no less than 90% of the results within 3-4 days or less from accessioning at the lab on average." *See* DOH Contract ¶ 5(a), (b), (d).

15. Under the DOH Contract, Quest agreed "that the rate for testing will be no greater than One Hundred Dollars ($100.00) in accordance with [CMS Ruling CMS-2020-01-R] https://www.cms.gov/files/document/cms-2020-01-r.pdf, or a lesser rate for comparable testing if the foregoing is modified by CMS for each completed COVID-19 PCR test reported or lower rate agreed to by the Lab Provider and Facility." *See* DOH Contract ¶ 7.

16. The DOH Contract further provided that Quest "will establish, the mechanism for payment, which may include but is not limited to, invoicing the Facility directly for the Testing Services on an account bill basis or the Facility's (or its employees to the extent applicable) insurance provider (e.g., individual and small group comprehensive health insurance, commercial insurance, or self-funded policies or contracts, Medicaid/Medicare or other federal funding sources, if applicable ("third party payors"))." *See* DOH Contract ¶ 7.

17. Additionally, the DOH Contract stated that, "[i]n the event that [Quest] experiences any collection issues, [Quest] shall provide NYS with written notice of such collection issues and upon demonstration that the [Quest] and/or [the nursing home]

Facility has made reasonable efforts to obtain payment and has been denied payment from all applicable or appropriate third-party payors NYS will assist the [Quest Diagnostics] and/or Facility in seeking reimbursement from such third-party payors, federal funding sources and/or other funding sources, as applicable . . . ." *See* DOH Contract ¶ 7.

## QUEST'S EXECUTED CONTRACT WITH DEFENDANT

18. Defendant and Quest executed a written Agreement for Quest to provide to Defendant laboratory services in connection with and for Defendant's compliance with the NYS Executive Order 202.30, including reference to the DOH Contract, a copy of which is an attachment of Defendant's Contract. A true and correct copy of Defendant's Contract is attached hereto as **Exhibit B** ("Defendant's Contract").

19. Specifically, the recitals in Defendant's Contract states in relevant part:

> "WHEREAS, in light of EO 202.30 and the ongoing Disaster Emergency, LTC Facility hereby engages Quest Diagnostics to perform the required COVID-19 testing for its staff and employees (the "Covered Employees") in compliance with and during the effective term of EO 202.30, and as may be extended or modified from time to time by Governor Cuomo and/or New York State;"

20. Further paragraph 3.1 of Defendant's Contract states:

> "3.1 Quest Diagnostics shall have the right to bill LTC Facility for the Testing Services performed pursuant to this Agreement, and LTC Facility shall reimburse Quest Diagnostics for SARS-CoV-2 RNA (COVID-19), Qualitative NAAT, Test Order Number 39448 at rate of $100.00 per test.

21. Further paragraph 3.2 of Defendant's Contract provides for attorneys' fees and costs and expenses incurred in collecting sums owed to Quest, including litigation related expenses; specifically, the Defendant's Contract provided:

> "3.2 LTC Facility agrees to make payment to Quest Diagnostics by check, ACH payment, certified money order, or electronic wire within thirty (30) days of the date of each Quest Diagnostics invoice for laboratory services, after which any undisputed unpaid invoice amounts shall be overdue. Where available, LTC Facility will be invoiced monthly via Quest Diagnostics eInvoice (Quest web-based invoicing system) or other similar electronic invoicing system. Paper invoices may incur additional fees. In the event that Quest Diagnostics sends the account for collection and/or initiates litigation in order to collect overdue amounts, LTC Facility shall be liable for all costs and expenses of such collection and/or litigation, including reasonable attorneys' fees, court costs and expenses."

## DEFENDANT UTILIZED QUESTS COVID-19 TESTING SERVICES AND REFUSED TO PAY QUEST

22. In accordance with the terms of Executive Order and Defendant's Contract, Defendant utilized Quest's COVID-19 testing services in order to test its staff and personnel twice per week. Specifically, Quest performed 1891 tests at Defendant's Facility between May and November, 2020.

23. Pursuant to Defendant's Contract, Quest sent invoices to Defendant on a monthly basis for its COVID-19 testing of Defendant's staff and personnel. In accordance with Paragraph 7 of the DOH Contract and paragraph 3.1 of Defendant's Contract, Quest billed Defendant $100 per COVID-19 test performed. Under the terms of the invoices, Defendant was required to remit payment to Quest within thirty (30) days of receipt.

24. To date, Defendant has refused to pay the balance from any of these invoices. According to Quest's invoices, Defendant owes Quest an outstanding balance of $175,700.00 for COVID-19 testing. *See* Invoices attached hereto as **Exhibit C**. Quest's invoices reflect the balances after accounting for any payments from third party payors, including insurance proceeds.

25. Quest's efforts to collect outstanding balances from third party sources were unsuccessful.

26. In accordance with Paragraph 7 of the DOH Contract, on or about May 28, 2021, Quest sent a written notice to the DOH advising that it was experiencing collection issues for laboratory testing services related to the Executive Order. Specifically, in its letter, Quest informed the DOH that it was owed, in the aggregate, more than $12 million from nearly three dozen nursing home facilities. Quest further advised:

> "The Agreement allowed for flexibility in the billing mechanisms to be used by Quest Diagnostics and most of the Facilities were set up as account bill such that the Facilities would be invoiced for testing services, but we have also attempted to do third party billing to payers based on requests from certain of the Facilities. Despite repeated collection attempts made by Quest Diagnostics to the Facilities and extensive efforts to submit claims to third party payers where requested by the Facilities, Quest Diagnostics has received no concrete assurances of payment from any source for a significant portion of the services we have performed."

## DEFENDANT REFUSED TO PAY THE INVOICES

27. Defendant has advised Quest in writing that it will not pay Quest's invoices, and directed it to seek payment from other sources, including third-party payors. Defendant—with full knowledge of the contents and amount of the invoices—did not allege that Quest failed to perform the COVID-19 testing set forth in the invoices.

## FIRST CLAIM FOR RELIEF
### *Breach of Contract*

28. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "27" above with the same force and effect as if fully set forth herein.

29. Quest and Defendant executed Defendant's Contract Agreement for services to be rendered, which included confirmation that the cost per test would be up to $100.00. *See* Exhibit B.

30. Plaintiff provided COVID-19 testing for Defendant's personnel in accordance with the terms of Defendant's Contract. Specifically, Plaintiff performed 3,320 tests for Defendant's Facility between June 2020 and December 2020. Plaintiff provided timely invoices to Defendant for the COVID-19 tests it performed under Defendant's Contract. Defendant never objected to the accuracy of the sums owed as stated in the invoices submitted to it for the services and, in fact, accepted those services.

31. In breach of Defendant's Contract, Defendant has failed and refused despite due demand, to pay Plaintiff the sum of $175,700.00 for COVID-19 testing on behalf of Defendant, which occurred between June 2020 and December 2020.

32. By reason of the foregoing breach of the Agreement, Plaintiff has been damaged in the amount $175,700.00, together with applicable pre-judgment interest thereon.

## SECOND CLAIM FOR RELIEF
*Breach of the DOH Contract*

33. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "32" above with the same force and effect as if fully set forth herein.

34. Even if Defendant contests the validity of Defendant's Contract, nevertheless, Defendant caused or required its personnel to submit to COVID-19 tests twice per week and submitted those tests to Quest for laboratory testing and therefore accepted the test results without objection, in order to comply with Executive Order 202.30. Therefore, Defendant assumed the DOH Contract and ratified its terms to Quest's benefit, including to pay for the testing performed by Quest, with full knowledge of its obligations to pay Quest for such testing.

35. Defendant therefore assumed the responsibilities and terms of the DOH Contract by accepting Quest's testing services without raising any objections until months later. *See Impulse Mktg. Grp., Inc. v. Nat'l Small Bus. Alliance, Inc.*, 2007 WL 1701813, at *5 (S.D.N.Y. June 12, 2007).

36. Defendant assumed the obligations of the DOH Contract by its conduct recognizing the existence of the DOH Contract by:

   a. Causing or requiring its employees to submit samples or COVID-19 testing to comply with Executive Order 202.30.

   b. Submitting those samples to Quest for COVID-19 testing.

   c. Accepting the results of Quests COVID-19 testing of Defendant's employees.

   d. Acknowledging that it faced substantial fines if it did not comply with Executive Order 202.30 by requiring or causing its employees to be tested

for COVID-19, demonstrating that Defendant was the real party in interest under the DOH Contract;

e. The conduct of the parties recognized the existence of the DOH Contract and its terms; therefore, defendant assumed the rights and obligations of the DOH Contract.

37. In breach of the assumed contract, Defendant has refused, despite due demand, to pay Plaintiff the sum of $175,700.00 for COVID-19 testing on behalf of Defendant, which occurred between June 2020 and December 2020.

38. By reason of the foregoing breach of the DOH Contract, Plaintiff has been damaged in the amount of $175,700.00, together with applicable pre-judgment interest thereon.

### THIRD CLAIM FOR RELIEF
*Account Stated*

39. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "38" above with the same force and effect as if fully set forth herein.

40. Plaintiff sent and rendered to Defendant the following statements of account and invoices for COVID-19 testing services provided by Plaintiff to Defendant:

| Invoice No. | Invoice Date | Invoice Amount | Past Due Amount | Total Balance Due |
|---|---|---|---|---|
| 9189699102 | 10/27/2020 | $86,700.00 | $106,300.00 | $193,000.00 |
| 9190182474 | 11/24/2020 | $67,800.00 | $139,100.00 | $206,900.00 |
| 9190666521 | 12/28/2020 | $21,200.00 | $206,900.00 | $228,100.00 |

True and correct copies of these statements of accounts and invoices are collectively attached hereto, and incorporated herein, as **Exhibit C.**

41. Defendant received, accepted and retained all of said invoices and account statements. Defendant did not raise an objection to Plaintiff's invoices until October

2020, when it argued that it was not the party responsible for the Invoices, but it did not challenge the accuracy of the sums stated in the Invoices. As set forth above, none of Defendant's objections to Plaintiff's invoices are reasonable. The New York DOH has explicitly agreed that $100 per COVID-19 test—which is the rate Plaintiff has charged—is reasonable, as reflected in Paragraph 7 of the DOH Contract. Moreover, Defendant agreed in Defendant's Contract that $100 per COVID-19 test is reasonable.

42. Defendant continued to make payments to Plaintiff for the past due amounts owed under the invoices, leaving a remaining balance due of $175,700.00.

43. As a result of the foregoing, an account was taken and stated between Plaintiff and Defendant, which showed a balance, in the amount of $175,700.00, is due and owing by Defendant to Plaintiff.

44. No part of said balance due in the amount of $175,700.00 has been paid by Defendant, despite due demand therefor.

45. By reason of the foregoing, Defendant is presently indebted to Plaintiff in the sum of $175,700.00, together with applicable interest thereon.

### FOURTH CLAIM FOR RELIEF
*Costs and Attorneys' Fees*

46. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "45" above with the same force and effect as if fully set forth herein.

47. Defendant's Contract includes a fee-shifting provision in Paragraph 3.2, which provides that in "the event Quest Diagnostics sends the account for collection and/or initiates litigation in order to collect overdue amounts, LTC Facility [Defendant] shall be liable for all costs and expenses of such collection and/or litigation including

reasonable attorneys' fees, court costs and expenses." *See* Defendant's Contract ¶ 3.2, Ex. B.

48. Defendant never objected to any of the terms in the Agreement or the invoices submitted to it for the services, but did accept the services.

49. Quest demanded payment under the Agreement numerous times, prior to commencing this action.

50. By reason of Quest having to enforce its rights by collection and litigation, Defendant is liable to Quest for Quest's costs, expenses, and attorneys' fees incurred in attempting to collect and litigate to enforce Defendant's Contract and receive payment from Defendant, together with applicable pre-judgment interest thereon.

## FIFTH CLAIM FOR RELIEF
*Unjust Enrichment*

51. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "50" above with the same force and effect as if fully set forth herein.

52. In the event that it is found that no contract exists between Plaintiff and Defendant, Defendant is liable to Plaintiff for the COVID-19 testing services it received from Plaintiff.

53. It would be against equity and good conscience to allow Defendant to retain the benefit of Plaintiff's COVID-19 testing services—and its corresponding ability to remain an ongoing operation under the Executive Order 202.30—without paying for it, particularly at the reasonable charge of $100 per test.

54. Defendant has been unjustly enriched at Plaintiff's expense in the principal amount of $175,700.00, plus pre-judgment interest.

### SIXTH CLAIM FOR RELIEF
*Quantum Meruit*

55. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "54" above with the same force and effect as if fully set forth herein.

56. During the period between June 2020 and December 2020, Plaintiff rendered COVID-19 testing services to Defendant, and incurred expenses on Defendant's behalf, in furtherance of Executive Order 202.30.

57. Defendant accepted and received the benefits of Plaintiff's services with knowledge that Plaintiff expected to be compensated for same.

58. The fair and reasonable value of the services rendered by Plaintiff—for which payment by Defendant has not been made—equals or exceeds the sum of $175,700.00, which reflects the reasonable rate of $100 per COVID-19 test.

59. By failing and refusing to pay Plaintiff for the services rendered, Defendant has been unjustly enriched.

60. By reason of the foregoing, Plaintiff has been damaged in an amount to be determined at trial, but reasonably believed to be no less than $175,700.00, together with applicable interest thereon.

### SEVENTH CLAIM FOR RELIEF
*Money Had and Received*
*(FEMA Reimbursement)*

61. Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "60" above with the same force and effect as if fully set forth herein.

62.     In addition to its contractual liabilities as hereinbefore alleged, upon information and belief, Defendant was/is also entitled to reimbursement for expenses incurred for testing its employees and personnel for COVID-19 from the Federal Emergency Management Agency ("FEMA").

63.     If, in fact, Defendant has applied for and has been reimbursed by FEMA for expenses it incurred in testing its employees and personnel for COVID-19, any such money received and possessed by Defendant, and for which it is benefitting, is money that in equity and good conscience should not be retained by Defendant, but should be turned over to Plaintiff, to whom it rightfully belongs by virtue of the COVID-19 testing it performed at the request of and for Defendant.

64.     By reason of the foregoing, the reimbursement of COVID-19 testing expenses provided by FEMA to Defendant is properly money had and received by Defendant that in equity and good conscience should be turned over to Plaintiff, the amount of which will have to be determined at trial, together with pre-judgment interest thereon.

## DEMAND FOR JURY TRIAL

65.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury in this matter.

## PRAYER FOR RELIEF

Plaintiff demands judgment against Defendant as follows:

a. On its First Claim for breach of contract, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

b. On its Second Claim for breach of contract, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

c. On its Third Claim for account stated, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

d. On its Fourth Claim for collection and litigation costs, expenses, and reasonable attorneys' fees, awarding Plaintiff damages against Defendant in an amount to be determined, together with applicable interest thereon;

e. On its Fifth Claim for unjust enrichment, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

f. On its Sixth Claim for quantum meruit, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

g. On its Seventh Claim for money had and received, awarding Plaintiff damages against Defendant in the amount of $175,700.00, together with applicable interest thereon;

h. Awarding Plaintiff costs and disbursements of this case, prejudgment interest, and such other and further relief as the Court may deem just and proper.

Dated: December 9, 2021
Rochester, New York

Respectfully Submitted,

THE GLENNON LAW FIRM P.C.

By: */s/ Peter J. Glennon*_____
Peter J. Glennon, Esq.
*Attorneys for Plaintiff*
*Quest Diagnostics, Inc.*
160 Linden Oaks,
Rochester, NY 14625

                    585-210-2150
                    Email: PGlennon@GlennonLawFirm.com